IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TAMMY K. KUYKENDALL,

    Plaintiff,

v.                                                          CV 13-877 MV/WPL

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

    Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

Tammy Kuykendall applied for disability insurance benefits and supplemental security income on August 2, 2010, based on loss of use of her right hand due to nerve damage, bone spurs in her back, osteoarthritis, a right shoulder injury, and anxiety. (Administrative Record "AR" 166-73, 220.) After her applications were denied at all administrative levels, she brought this proceeding for judicial review. The case is before me now on Kuykendall's Motion to Remand or Reverse, a response filed by the Commissioner of the Social Security Administration ("SSA"), and Kuykendall's reply. (Docs. 22-25.) For the reasons explained below, I recommend that the Court grant Kuykendall's motion and remand this case to the SSA for proceedings consistent with this Proposed Findings and Recommended Disposition ("PFRD").

**STANDARD OF REVIEW**

When the Appeals Council denies a claimant's request for review, the Administrative Law Judge's ("ALJ") decision is the SSA's final decision. In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the

correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation omitted). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is a mere scintilla of evidence supporting it. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence does not, however, require a preponderance of the evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214. The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show us that [he] has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

### SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or nondisability is directed at any point, the ALJ will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). At the fourth step, the ALJ compares the claimant's RFC with the functional requirements of her past relevant work to see if the claimant

is still capable of performing her past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing her past work, then she is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to her past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Kuykendall is a fifty-three-year-old woman with a high school diploma and two years of college. (AR 154, 221.) She worked as a school bus driver from 1997 to 2008, with intermittent work for the Census Bureau as a crew leader and for H & R Block as a data entry clerk. (AR 208, 221.) Kuykendall claims disability beginning on May 28, 2008, based on lumbar degenerative disc disease and facet arthropathy, right ulnar neuropathy, bone spurs in her back, osteoarthritis, a right shoulder injury, and anxiety. (AR 84, 220.) Kuykendall submitted hundreds of pages of medical records, including records of multiple surgeries, to the SSA. Because Kuykendall claims that the ALJ erred in regard to his evaluation of certain medical source opinions, I focus my discussion on those opinions.

Kuykendall's medical records begin on July 3, 2006. From there, the AR contains hundreds of pages of records reflecting x-rays, MRIs, physical therapy, and diagnoses of degenerative disc disease, degenerative joint disease, facet arthropathy, spondylolisthesis, and various tendon tears. (*See* AR 300-81, 387-467, 544-700, 740-69, 793-866.)

W. Murray Ryan, M.D., performed a consultative review of Kuykendall for New Mexico Disability Determination Services ("DDS") on August 14, 2009. (AR 383.) Dr. Ryan obtained an oral medical history from Kuykendall and reviewed some medical records sent over from DDS. Some of the MRI reports had portions blacked out, so Dr. Ryan did not consider them reliable. (*Id.*) Dr. Ryan assessed Kuykendall with depression and musculoskeletal pain, with an increased thoracic kyphosis but an otherwise fairly normal physical exam. (AR 383-84.)

On August 26, 2009, Elizabeth Chiang, M.D., conducted a non-examining Psychiatric Review Technique ("PRT") on Kuykendall at the behest of DDS. (AR 522.) Dr. Chiang found the medically determinable mental impairment of depression, but concluded that it did not qualify as severe. (AR 522, 525.) Dr. Chiang found that Kuykendall experienced no periods of decompensation and no limitations on activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace. (AR 532.) Kuykendall reported that her depression was related to her physical condition and her inability to work, and that she has never had nor felt the need to seek treatment from a mental health professional. (AR 534.)

Non-examining state agency consultant, N.D. Nickerson, M.D., reviewed Kuykendall's DDS file and conducted a Physical RFC Assessment on August 28, 2009. (AR 536-43.) Dr. Nickerson assessed Kuykendall with degenerative disc disease and degenerative joint disease of the lumbar spine at L4-L5 and L5-S1, degenerative joint disease bilaterally in her knees, and obesity. (AR 536.) Dr. Nickerson found exertional limitations to the extent that Kuykendall could occasionally lift or carry up to fifty pounds, frequently lift or carry up to twenty-five pounds, stand or walk for a total of about six hours in an eight-hour workday, sit with normal breaks for a total of about six hours in an eight-hour workday, and engage in unlimited pushing and pulling. (AR 537.) Dr. Nickerson found no other limitations. (AR 538-42.)

Kuykendall went to Orthopaedics & Sports Medicine of Santa Fe on May 13, 2010, for an evaluation of numbness in the fourth and fifth fingers of her right hand that began after she had right elbow surgery. (AR 698.) Samuel Chun, M.D., assessed Kuykendall with right ulnar neuropathy, partial nerve functional loss with motor function being mostly intact, and abnormal sensory function. (AR 698-99.)

On August 8, 2010, Dr. Chun could not elicit the Tinel's sign at Kuykendall's right elbow or her forearm, but found it still present at the distal palmar crease. (AR 697.) This marked no change in Kuykendall's nerve status. (*Id.*)

Kuykendall filled out a Function Report on November 22, 2010, and indicated that her activities of daily living included getting up, studying, cleaning part of the house, taking night classes, and going to bed. (AR 252.) Her husband, Lanny Kuykendall, filled out a Third Party Function Report on November 26, 2010. (AR 231.) Lanny reported that, before her onset date, Kuykendall could do "most everything," but now she does not sleep in bed all night and must sleep on a recliner due to pain, has no control of her right hand, needs help with zippers and buttons, needs help getting in and out of the shower, cannot stand for long periods and has difficulty preparing meals, and maintains few hobbies due to pain and lack of control of her right hand. (AR 232-37.)

Robert Krueger, Ph.D., at the request of DDS, conducted a psychological consultative examination on Kuykendall on December 14, 2010. (AR 702.) Dr. Krueger conducted a clinical interview with a biopsychosocial history, mental status examination, and review of documents. Kuykendall reported chronic pain and a variety of chronic medical problems, including emotional difficulties, particularly with anxiety. (*Id.*) She was a full-time student at the University of New Mexico, Taos Campus. (AR 703.) Kuykendall stated that she was unable to

5

sit for long periods because her shoulder and back pain interfere with her work performance. (*Id.*) Kuykendall presented as moderately anxious, and her emotional expression was appropriate to her mood. (AR 704.) She did not appear to meet the full criteria for having a specific anxiety disorder or major depressive disorder. (*Id.*) Dr. Krueger diagnosed Kuykendall with anxiety disorder NOS, rule out generalized anxiety disorder; and depressive disorder NOS, with moderate psychosocial stressors; and assessed her with a recent GAF of 55-60.[1] (*Id.*) He found Kuykendall to have "some significant functional impairment," and noted that "[b]ecause of chronic pain and limited movement along with having chronic problems with anxiety, she can be expected to have mild impairment with understanding, remembering, and following simple work instructions and moderate impairment with complex or detailed instructions." (AR 705.) Further, Kuykendall can be expected to have moderate impairment with maintaining pace and persistence in work environments, and may have marked impairments during periods of exacerbated orthopedic pain. (*Id.*) Dr. Krueger found that Kuykendall experiences mild to moderate impairment in relationships with coworkers, supervisors, and the general public; moderate to marked impairment with traveling to distant places alone; and moderate impairment with being aware of and reacting appropriately to dangers in the workplace. (*Id.*)

On January 14, 2011, Pamela Green, Ph.D., filled out a PRT on Kuykendall. Dr. Green concluded that Kuykendall suffered from coexisting nonmental impairments and that her medically determinable mental impairments of depressive disorder NOS and anxiety disorder NOS did not qualify as severe. (AR 706.) Dr. Green further concluded that Kuykendall had mild

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005) (hereafter "DSM-IV"). A score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Kuykendall's mental health providers used this scoring method.

restrictions in activities of daily living, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace. (AR 716.)

Marshall Reich, M.D., conducted a Disability Determination Examination on January 26, 2011. Dr. Reich observed a normal gait, noted that Kuykendall could hop on either foot, could only squat to approximately fifty percent, could touch her toes, and could walk on her heels and her toes. (AR 726.) She complained to Dr. Reich of easy fatigability, dry eye symptoms, ear infections mostly on the right side, sinus trouble, neck and back pain, shoulder pain, some tingling and numbness in her right hand, nervousness, anxiety, bronchitis, and indigestion. (AR 727.) Dr. Reich observed Kuykendall move with little pain and found excellent range of motion in her neck and equal grip strength on the right and left hands. (*Id.*) Dr. Reich was unable to elicit the numbness response in Kuykendall's right hand or evidence that she drops things with her right hand. (AR 728.) Dr. Reich diagnosed Kuykendall, based on radiographic evidence, with spondylolisthesis, a cyst at the L4-L5 disc area without herniation, and L4-L5 anterolisthesis. (*Id.*) Dr. Reich further noted that Kuykendall "has magnification symptomatology which does not correlate with [the] physical findings . . . ." (*Id.*)

Mark Werner, M.D., a medical consultant for DDS, filled out a physical RFC assessment on Kuykendall on February 15, 2011. He found a primary diagnosis of lumbar degenerative disc disease and facet arthropathy, secondary diagnoses of right ulnar neuropathy and obesity, and other alleged impairments of status post right shoulder and elbow surgeries. (AR 730.) Dr. Werner assessed Kuykendall with physical limitations to the extent that she could occasionally lift or carry up to twenty pounds, frequently lift or carry up to ten pounds, stand or walk for a total of about six hours in an eight hour workday, sit with normal breaks for a total of about six hours in an eight hour workday, and push or pull without limitations. (AR 731.) Kuykendall's

only postural limitation was that she could occasionally, rather than frequently, climb ladders, ropes, or scaffolds. (AR 732.) She could engage in unlimited reach in all directions, but experienced limitations with regard to handling, fingering, and feeling due to her right ulnar neuropathy. (AR 733.) Dr. Werner found no other limitation. (AR 733-34.) Finally, Dr. Werner did not find Kuykendall "fully credible" because of her symptom magnification. (AR 735-37.)

On March 11, 2011, Karine Lancaster, M.D., a non-examining consultative examiner for DDS, reviewed Dr. Werner's physical RFC assessment and agreed with all of the conclusions. (AR 738-39.)

On May 9, 2011, Kuykendall filled out a Function Report indicating that her daily routine consisted of getting up, showering, getting help getting dressed and doing her hair, going to class, coming home, watching TV, doing homework, and going to bed. (AR 270.) Kuykendall reported that her husband does most of the housework, cooking, and taking care of the pets because she is in pain. (AR 271.) Kuykendall averred that she has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, using her hands, and getting along with others. (AR 275.) The most she can lift is fifteen pounds. (*Id.*) Finally, Kuykendall reported that, since the onset of her disability, she gets more anxious around people and becomes more easily upset. (AR 276.)

Kevin Ragsdale, Ph.D., conducted a PRT of Kuykendall through July 22, 2011. Dr. Ragsdale concluded that Kuykendall had coexisting nonmental impairments and that her medically determinable mental impairments of depressive disorder NOS and anxiety disorder NOS were not severe. (AR 771-76.) Dr. Ragsdale found mild restrictions in Kuykendall's activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace. (AR 781.) He concluded that her mental symptoms had not worsened or intensified since

the initial disability determination. (AR 782.) Finally, Dr. Ragsdale wrote that "the [medically determinable mental impairments] are assessed as not-severe because the totality of the evidence indicates that their limiting effects are not associated with more than slight abnormalities that minimally affect [Kuykendall's] ability to meet the mental demands of basic work activity reliably/effectively." (AR 783.) He affirmed Dr. Green's PRT of January 14, 2011. (AR 770.)

On November 17, 2011, Paul E. Walsky, M.D., of Neurology of Santa Fe, diagnosed Kuykendall with right ulnar neuropathy, presenting with worsening electrodiagnostic findings. (AR 854.)

Lawrence Kuo, M.D., a non-examining medical consultant for DDS, conducted a physical RFC assessment of Kuykendall running from July 27, 2011, through March 9, 2012. (AR 785.) Dr. Kuo assessed Kuykendall with a primary diagnosis of status post left shoulder rotator cuff repair, a secondary diagnosis of degenerative disc disease with facet arthropathy, and other alleged impairments of right ulnar neuropathy and status post right shoulder and elbow surgeries. (*Id.*) Dr. Kuo agreed with Dr. Werner's determination of Kuykendall's physical and postural limitations. (AR 786-87.) Dr. Kuo determined that Kuykendall could engage in unlimited reaching in all directions and unlimited feeling, with limited handling and fingering due to right ulnar neuropathy. (AR 788.) He found no other limitations. (AR 788-89.) Dr. Kuo agreed that Kuykendall displayed some symptom magnification. (AR 791-92.)

The Appeals Council reviewed documents submitted after the ALJ hearing and made them part of the record on appeal. (AR 6.) On January 26, 2012, Dr. Guttmann performed a nerve release in situ with decompression on Kuykendall's right elbow, with a post-operative diagnosis of right elbow ulnar neuropathy cubital tunnel syndrome. (AR 869.)

**HEARING TESTIMONY**

The ALJ held a hearing on September 21, 2012, at which Kuykendall and a Vocational Expert ("VE") testified. (AR 36.) Kuykendall was represented by an attorney. (*Id.*)

First, the ALJ questioned Kuykendall. Kuykendall testified that she is right-handed, has two children, attended some college courses but does not hold a degree, and has worked since her alleged onset date of May 28, 2008. (AR 40-42.) Although records obtained by the SSA show that Kuykendall worked for a hardware store in early 2011, she testified that this did not happen and is an error. (AR 42.) She did some census work in 2010, ran the election bureau on election day, and did some accounting for her husband after her alleged onset date. (AR 42-44.)

The VE stated that she did not have any information about Kuykendall's employment for the last fifteen years and asked the ALJ to have Kuykendall clarify the record. (AR 44.)

Kuykendall then testified that she did not work at all in 2011 or 2012. (AR 45.) She did approximately eleven weeks of census work in 2010, during which she was in charge of collecting data from other census-takers and sending it to Santa Fe. (AR 43, 45.) Kuykendall stated that the majority of her work experience was as a bus driver for the Mesa Vista Consolidated Schools.[2] (AR 46.) She started driving in about 1999 and worked full-time for several years. (AR 46-47.) Kuykendall testified that the heaviest weight she lifted was approximately fifty pounds, and that she did some other activities, like moving things and performing some maintenance. (AR 47-48.) She also did some substitute teaching before she started driving, but this was more like monitoring or babysitting than teaching. (AR 49.) In between bus routes, Kuykendall stated that she did some work entering client names for a State

---

[2] The Hearing Transcript mistakenly lists this employment as for the "Masochistic Consolidated Schools." (AR 46.)

Farm agent for about eighteen months. (AR 46-47.) She has some other part-time work in her history, but none of it was significant. (AR 47.)

The ALJ then turned matters over to Kuykendall's attorney to continue her testimony. Kuykendall testified that she injured her back while driving the bus; this initiated disc compression in her spine and additional injuries to both shoulders. (AR 50.) The injuries did not result from an accident, but rather developed slowly. (*Id.*) She had her first surgery around the year 2000 to repair the damage, and has had a total of thirteen surgeries. (*Id.*) Kuykendall said that her worker's compensation claims were denied because the injuries were on-going instead of a one-time accident. (AR 51.) She brought an oxygen tank with her to the hearing, and has been on oxygen, as prescribed by Sandra Hamilton, since around January 2012. (AR 51.) She uses oxygen for asthma and other respiratory issues, and though it helps, it is only a slight improvement, and she feels fatigued during the day. (AR 59-60.) Kuykendall then recounted that her right ulnar nerve was cut during surgery, so her fourth and fifth fingers are numb and her right hand goes into spasms. (AR 53.) Kuykendall stated that although Dr. Guttmann opined that the injury was getting better, the nerve conduction tests show it has gone downhill. (AR 54.)

Kuykendall said that Dr. Ryan spent about fifteen minutes with her during the consultative examination and would not listen to her. (AR 54.) She further testified that Dr. Reich[3] spent about twenty minutes with her and said that he could tell that something was wrong, but could not write a true evaluation without the doctors' reports. (AR 55.)

Kuykendall reported pain and swelling in her knees, that she can stand for approximately twenty minutes before they begin hurting, and that she has to sit down within half an hour of

---

[3] The Hearing Transcript identifies this person as "Dr. Wright." (AR 55.) However, no "Dr. Wright" appears in the record. I assume that this is supposed to read "Dr. Reich," one of the consulting examiners.

11

standing or within walking a city block. (AR 55-56.) Because of the pain in her back, she cannot stand up to do the dishes or vacuum, but she can fold laundry if she can sit down. (AR 56.) Kuykendall said that she has pain in her shoulders, which she described as "somebody pour[ing] hot water down [her] back," and arthritis that leads to a constant ache unless she gets epidural injections. (AR 57.) Her right hand spasms periodically. (AR 58.) When it spasms, Kuykendall said that she cannot use her hand. (AR 58-59.) When it is not in a spasm, she said that she can pick things up but frequently drops things. (*Id.*) She testified to taking meloxicam, Celebrex, and gammamine every day for pain. (AR 58.)

Kuykendall testified that she was attending classes at the University of New Mexico-Taos campus approximately seven hours a week, but that she had some concentration problems and recently dropped a class because she had difficulties retaining information. (AR 56-57.)

The ALJ then confirmed with the VE that the VE had read the file and listened to Kuykendall's testimony. (AR 61.) The VE categorized Kuykendall's prior work experience as an accounting clerk, sedentary, with a specific vocational preparation level ("SVP") of 4; a data clerk, light, with an SVP of 2; and as a bus driver,[4] medium, with an SVP of 4. (AR 61-62.)

The ALJ asked if someone could do these jobs if they were an individual of Kuykendall's age, education, and past work experience, who was limited to the light exertional level and had the additional limitations that she could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but only occasionally climb ladders, ropes, or scaffoldings; could frequently handle and finger with her right hand; and had to avoid concentrated exposure to extreme heat and cold, wetness, and humidity; exposure to poorly ventilated areas; and exposure to

---

[4] The Hearing Transcript identifies this job as "bed striker." (AR 62.) Again, this does not coincide with the other testimony, so I assume that this job is "bus driver."

environmental irritants such as fumes, odors, gas, or dust. (AR 62-63.) The VE testified that such a person could be a data clerk. (AR 63.)

The ALJ then asked the same question with the additional limitations that the person could only occasionally climb, balance, stoop, kneel, crouch, or crawl, and only occasionally handle and finger with the right hand. (AR 63.) The VE testified that such a person could not do Kuykendall's previous work, but could do other jobs in the national economy, such as a furniture rental clerk, light, with an SVP of 2, and more than 8,200 such jobs in the region and 90,000 nationally; a school bus monitor, light, with an SVP of 2, and more than 3,000 jobs regionally and 79,000 nationally; or a tanning salon attendant, light, with an SVP of 2, and more than 1,500 jobs regionally and 30,000 nationally. (AR 63-64.)

Finally, the ALJ asked if someone of Kuykendall's age, education, and past work experience could find work if she was limited to the sedentary exertional level; could occasionally climb, balance, stoop, kneel, crouch, or crawl; occasionally handle and finger with the right hand; had the same environmental limitations as above; and, additionally, because of breathing problems would require four or more occasional work breaks of about fifteen minutes in duration during an eight-hour workday. (AR 64-65.) The VE testified that such a person would be unable to work. (AR 65.)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ issued his decision on November 13, 2012. (AR 16.) He reviewed Kuykendall's application for benefits according to the sequential evaluation process. (AR 19-27.) At the first step, the ALJ found that Kuykendall had not engaged in substantial gainful activity since May 28, 2008, the alleged onset date. (*Id.*)

Then, at the second stop, the ALJ concluded that Kuykendall suffers from the severe impairments of obstructive sleep apnea, esophageal reflux, asthma, status post left shoulder rotator cuff repair, degenerative disc disease with facet arthropathy, right ulnar neuropathy, status post right shoulder and elbow surgery, degenerative joint disease, and obesity. (AR 21-22.) The ALJ stated that Kuykendall's mental impairments cause no more than minimal limitations and are therefore nonsevere. (AR 22.) The ALJ discussed Dr. Krueger's December 2010 psychological evaluation, in which Dr. Krueger observed moderate depression with consistent affect, and diagnosed Kuykendall with anxiety disorder and depressive disorder, despite the fact that she did not meet the diagnostic criteria. (*Id.*) The ALJ gave little weight to Dr. Krueger's assessment of Kuykendall's physical limitations as they are outside his area of expertise, and gave moderate weight to his opinion regarding the existence of medically determinable impairments and their effects. (*Id.*) The ALJ then gave "great weight" to Dr. Ragsdale's opinion for purposes of establishing "paragraph B" criteria, and adopted his opinion for purposes of "establishing the nature and severity of [Kuykendall's] mental impairments and the impact on her ability abilities to function." (*Id.*)

The ALJ found no limitation on Kuykendall's activities of daily living, no episodes of decompensation, mild limitation with social functioning, and mild limitation with maintaining concentration, persistence, or pace. (*Id.*) He then noted that Kuykendall is compliant with medication as prescribed by her primary care physician, and that Dr. Krueger found her mental impairments nonsevere based on the totality of the evidence. (AR 23.)

At step three, the ALJ found that Kuykendall's combination of impairments did not equal one of the listed impairments. (*Id.*) The ALJ then determined Kuykendall's RFC, finding that Kuykendall could perform work at the light exertional level subject to the following limitations:

14

she can occasionally climb, balance, stoop, kneel, crouch, or crawl; can occasionally handle and finger with the right hand; should avoid concentrated exposure to extreme heat, cold, wetness, or humidity; should avoid exposure to poorly ventilated areas; and should avoid exposure to environmental irritants such as fumes, odors, dusts, and gases. (*Id.*)

The ALJ explained the two-step process for evaluating a claimant's subjective reports of symptoms: 1) discerning the underlying medically determinable impairment that could produce the symptoms, and 2) evaluating the intensity, persistence, and limiting effects of the symptoms to determine how they affect the claimant's functioning. (AR 24.) The ALJ found that the medical evidence of record does not support conditions and attendant limitations that could reasonably be expected to produce Kuykendall's complained-of symptoms. (*Id.*) He then noted that Kuykendall was a full-time college student during her period of alleged disability. He gave "little weight" to Lanny's third-party function statement because the other evidence of record suggested that Kuykendall is much more capable. (*Id.*) The ALJ further discredited Kuykendall's description of her limitations in her function reports as being unsupported by the medical evidence. (*Id.*) The ALJ went on to find that Kuykendall's medically determinable impairments could reasonably be expected to cause Kuykendall's symptoms, but found her statements concerning intensity, persistence, and limiting effects to be not credible to the extent that they are inconsistent with the RFC. (*Id.*)

The ALJ gave "greater weight" to the opinion of the state agency sources. (AR 25.) He summarized Dr. Reich's opinion and, based on that examination, found that Kuykendall's claims of numbness and an inability to hold items in her right hand are inconsistent with the physical findings. (*Id.*) The ALJ further noted that obesity can be a severe impairment. (AR 25.) Because Kuykendall experiences significant restrictions on her ability to perform work-related functions

due to her obesity, obesity is a severe impairment. (*Id.*) The ALJ then summarized some of Kuykendall's medical procedures, including epidural injections and shoulder surgeries. (*Id.*) He returned to Dr. Reich's opinion that Kuykendall's physical examination was inconsistent with her subjective statements of limitations and found that Dr. Reich's reference to Kuykendall's symptom magnification reflected poorly on her overall credibility. (*Id.*)

Based on the VE's testimony, the ALJ concluded at step four that Kuykendall could not perform past relevant work. (AR 26.) At step five, the ALJ stated that "the claimant generally continues to have the burden of proving disability . . ., [but] a limited burden of going forward with the evidence shifts to the [SSA]." (AR 21.) The ALJ then found that, considering Kuykendall's age, education, work experience, and RFC, Kuykendall could perform the work of a furniture rental clerk, school bus monitor, or tanning salon attendant. (AR 27.) As the ALJ determined that Kuykendall could perform jobs existing in substantial numbers in the regional and national economies, the ALJ concluded that Kuykendall was not disabled. (*Id.*)

Kuykendall appealed the decision to the Appeals Council, but the Council found that her reasons for disagreeing with the ALJ's decision did not justify a review thereof, thus rendering the ALJ's decision the final decision of the Commissioner. (AR 1-5.) The Appeals Council stated that it looked at the record, including additional evidence made part of the record on appeal, and found no basis for changing the ALJ's decision. (AR 1-2; *see* AR 6.)

## DISCUSSION

Kuykendall makes five arguments for reversing and remanding this case. I have reordered these arguments to accord with the five-step sequential evaluation process. Kuykendall argues that the ALJ erred at the RFC stage in three ways: First, Kuykendall claims that the ALJ erred in his evaluation of medical opinion evidence. Second, she argues that the ALJ failed to

consider and include all of her medically determinable impairments when determining her RFC. And third, Kuykendall argues that the ALJ erred in his credibility analysis. Next, Kuykendall argues that the ALJ misstated the burden of proof at step five and that this error mandates remand. Finally, Kuykendall argues generally that the decision is not supported by substantial evidence.

Although Kuykendall's argument suffers from a dearth of citation to legal sources, she does argue that the ALJ's treatment of Drs. Krueger, Ragsdale, and Reich violated 20 C.F.R. § 404.1527. The AR in this case contains opinions from three examining sources and seven non-examining sources. The regulations require the ALJ to consider all medical opinions in the record and explain the weight assigned to such opinions. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Quintero v. Colvin*, 567 F. App'x 616, 619 (10th Cir. 2014) (unpublished). Medical opinions from examining sources are generally accorded greater weight than opinions from non-examining sources. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). All medical opinions from non-treating sources are evaluated based on supportability, consistency, specialization, and other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c).

First, the ALJ addressed the opinion of consultative psychologist Dr. Krueger. The ALJ accorded "little weight" to what he considered Dr. Krueger's remarks regarding Kuykendall's physical impairments because they are outside of his area of expertise. The ALJ gave "moderate weight" to his opinion regarding the existence and severity of Kuykendall's mental impairments. The ALJ offered no explanation as to why he accorded the remainder of Dr. Krueger's opinion "moderate weight" or how that affected his analysis. This was error. *See id.*; *Quintero*, 567 F. App'x at 619-20.

Next, the ALJ addressed the opinion of non-examining psychologist Dr. Ragsdale. The ALJ gave "great weight" to Dr. Ragsdale's opinion for purposes of establishing the nature and severity of Kuykendall's mental impairments and their effect on her ability to function, and adopted that opinion. However, the ALJ was internally inconsistent in adopting Dr. Ragsdale's opinion, as he went on to conclude that Kuykendall experiences mild limitations with social functioning and with concentration, persistence, or pace, but no limitation in her activities of daily living. Dr. Ragsdale found mild limitations in Kuykendall's activities of daily living. (AR 781.) Furthermore, the ALJ failed to assess the factors laid out in 20 C.F.R. §§ 404.1527(c),(e) and 416.927(c),(e) for evaluating non-examining source opinions. While the Commissioner is correct that the change would probably not move Kuykendall's mental impairments from the "nonsevere" category into the "severe" category, it does not absolve the ALJ of his responsibility to address and explain his handling of non-examining source opinions. The ALJ's failure to evaluate Dr. Ragsdale's opinion in accord with the regulations was error.

Finally, the ALJ addressed the opinion of examining physician Dr. Reich. The ALJ gave "greater weight" to Dr. Reich's opinions, including his finding that Kuykendall's reports of right hand spasms and other effects of right ulnar neuropathy were not credible. The ALJ does not explain how his assessment was impacted by Dr. Walsky's subsequent treatment notes that Kuykendall displayed weak right hand grip, dropped things from her right hand, had worsening electrodiagnostic findings on tests of the ulnar nerve, or had a subsequent surgery to decompress the nerve and repair the damage. This subsequent treatment record would qualify as "other factors" bearing on the weight of Dr. Reich's opinion. *See, e.g.*, 20 C.F.R. § 404.1527(c)(6). This failure to explain his evaluation of Dr. Reich's opinion in the context of the record as a whole constitutes error.

While the ALJ's discussion shows some consideration of the factors, he did not discuss supportability, consistency, specialization, and other factors with regard to the non-treating sources. Accordingly, I find that the ALJ committed legal error in failing to consider and discuss the factors in determining the weight to assign to these three non-treating sources' opinions. On remand, the ALJ must properly evaluate the non-treating sources' opinions and consider them in formulating Kuykendall's RFC. The ALJ may not disregard uncontroverted medical evidence in favor of opinion evidence. *See Clifton v. Chater*, 79 F.3d 1007, 1110 (10th Cir. 1996).

At step five, Kuykendall argues that the ALJ misstated the burden. I agree. While the claimant bears the burden of proof at the first four steps of the sequential evaluation process, the burden shifts to the Commissioner at the fifth step to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *Yuckert*, 482 U.S. at 146; *Williams*, 844 F.2d at 750-51; *Talbot*, 814 F.2d at 1460. This misstatement of the law was error.

Because I have found legal error at the RFC stage of the sequential evaluation process, I do not address alleged errors in the credibility analysis, whether the ALJ failed to consider or include all medically determinable impairments, or whether the decision is supported by substantial evidence.

## CONCLUSION

I recommend that the Court find that the ALJ committed legal error at the RFC stage by failing to appropriately consider the three non-treating sources' opinions as discussed in this PFRD. I recommend that the Court remand this case for proceedings consistent with this PFRD and direct the ALJ to consider and discuss the factors in 20 C.F.R. §§ 404.1527 and 416.927 for

the non-treating source analysis, and to review the burden at step five as set forth in 20 C.F.R. §§ 404.1520 and 416.920.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.